[913 NYS2d 165]

APPLEHEAD PICTURES LLC, Respondent, et al., Plaintiff, v RON-
ALD O. PERELMAN, Appellant, et al., Defendants.

First Department, December 2, 2010

## APPEARANCES OF COUNSEL

*Stillman, Friedman & Shechtman, P.C.*, New York City (*Charles A. Stillman, Scott M. Himes* and *Daniel V. Shapiro* of counsel), for appellant.

*Susman Godfrey LLP*, New York City (*Jacob W. Buchdahl, Stephen D. Susman* and *Rebecca S. Tinio* of counsel), for respondent.

**OPINION OF THE COURT**

NARDELLI, J.

The primary issue presented is whether two separately executed agreements—a marital separation agreement and a business operating agreement—can be deemed to be one integrated contract so that an alleged breach of the separation agreement can constitute a breach of the operating agreement that would justify a rescission of obligations under the operating agreement. We hold in the negative.

Plaintiff Applehead Pictures LLC is a Delaware limited liability company formed by defendant Ronald Perelman, along with his then wife, defendant Ellen Barkin, and her brother, defendant George Barkin, for the purpose of developing and producing feature films. Perelman and Ellen Barkin were married on June 28, 2000, after entering into a prenuptial agreement in which they agreed that, in the event of a civil divorce, "both parties will fully cooperate with each other in obtaining a Get or other religious divorce or annulment and each will promptly execute and deliver all documents required therefor," and, if required, personally appear before any religious court, tribunal or body. Perelman was obligated to pay all expenses in connection with the obtaining of a Get.

The prenuptial agreement also includes confidentiality provisions pursuant to which the parties agreed, among other things, not to, directly or indirectly, publish or issue press releases or grant interviews concerning specified "Prohibited Topics" or photographs, letters, diaries, and other specified items. They also agreed to take action to have the file sealed in any action *between* them for divorce.

Five years later, on November 29, 2005, Perelman, Barkin and her brother, George Barkin, formed Applehead, a Delaware limited liability company, for the purpose of developing and producing feature films, and entered into an operating agreement. The parties agreed that Applehead's business would be managed by the three members, except that the Barkins would have authority over day-to-day operations. Perelman was required to make capital contributions in the total amount of $3,433,750 ($1,675,000 for fiscal year 2006, and the same amount for fiscal year 2007, plus up to $83,750 to cover increased operating expenses for 2007). Profits were allocated 25% to Perelman, and 37.5% to each of the Barkins, and all losses were allocated to Perelman.

At her deposition, Ellen Barkin testified that Applehead was formed after her brother had acquired the rights to a book by

author Richard Yates, Easter Parade, through a company she owned, Barkin LLC. Perelman had not approved of her career as an actor, and they agreed that the production company would provide a way for her to continue working in the film industry. As its senior executive, Applehead hired Caroline Kaplan, who had extensive experience in the movie industry. Kaplan testified the aim was to establish Applehead as a "go-to company for writers and directors," and to begin developing about three to five film properties.

On February 9, 2006, Perelman and Barkin entered into a separation agreement and stipulation of settlement, and a judgment of divorce was entered five days later on February 14, 2006. The separation agreement incorporated and ratified the prenuptial agreement, including its provisions concerning confidentiality and the obtaining of a Get. It also provided that "the parties shall take all steps necessary to comply with the provisions of the [prenuptial agreement] and obtain a Get within three days of Wife's receipt of all of the payments required pursuant to paragraph 2," which provided for payment of about $10.5 million pursuant to the prenuptial agreement. The separation agreement further provided that Barkin would cause Applehead to vacate its offices, which were in the marital residence, by February 28, 2006.

On February 9, 2006, the same day the separation agreement was executed, Perelman, Barkin and George Barkin executed an amended operating agreement for Applehead. Nothing in the terms of the amended operating agreement made performance of its obligations conditioned upon compliance with the terms of the separation agreement. The amended agreement continued Perelman's obligation to make capital contributions in the total amount of $3,433,750 over the next two years, and provided a schedule for quarterly payments to be made starting on March 15, 2006 and continuing until December 15, 2007. Perelman's interest in net profits was reduced to 2%, and he continued to be responsible for 100% of losses. It is undisputed that Perelman did not pay the first amount due on March 15, 2006 or any of the subsequent amounts owed.

In or about June 2007, Barkin created a new company, Applehead Pictures II LLC, in order to handle "any new projects," and, according to Ellen Barkin, not have them "bogged down in litigation with Ronald Perelman," which Applehead anticipated commencing to recover the money owed to it. The rights to Easter Parade were conveyed to Applehead II. Applehead II never

had any separate offices, employees or bank accounts. Its separate expenses were borne by Barkin, and in January 2008, Applehead II reassigned all of its assets to Applehead.

On August 1, 2007, Applehead commenced a breach of contract action against Perelman to recover $3.4 million in damages resulting from his alleged breach of the amended operating agreement. After a motion to disqualify plaintiff's counsel was denied (see 55 AD3d 348 [2008]), Perelman filed an answer in which he admitted that he had not made the capital contributions required under the operating agreement, but asserted affirmative defenses, including that any obligation on his part was "excused by prior breaches," and that there had been a "failure of consideration."

On November 27, 2007, Perelman commenced this derivative action on behalf of Applehead against, inter alia, the Barkins and Caroline Kaplan, as well as Applehead as a nominal defendant. Perelman alleged that defendants had covertly established Applehead II in May 2007 to compete with Applehead, used its funds to pay for a competing venture, and paid at least $7,000 to an entity owned by Barkin. He further alleged that George Barkin did not spend his full time working on behalf of Applehead as "initially contemplated," although he was paid $250,000 annually. The two actions were eventually consolidated in an order.

By notice of motion dated April 23, 2009, Applehead moved for partial summary judgment against Perelman on its claim for breach of the amended operating agreement, and relied on Perelman's admission in his answer that he had not made the required payments. It argued that, under the Delaware Limited Liability Company Act, Perelman did not have a valid defense, since an LLC member is "obligated to a limited liability company to perform any promise to contribute cash or property to perform services, even if the member is unable to perform because of death, disability or any other reason," and "the obligation of a member to make a contribution . . . may be compromised only by consent of all the members" (Del Code Ann, tit 6, § 18-502 [a], [b]). It further argued that Perelman could not force renegotiation of the agreement, which does not permit dissolution even in the event of death or insanity of a member, and does not permit a member to withdraw or resign.

Applehead also contended that regardless of whether Barkin had breached the separation agreement, Perelman's capital commitment to Applehead was still independently enforceable since

the two agreements did not form a "unitary contract," as they involved different parties, served different purposes, and did not refer to each other. Further, the parol evidence rule precluded Perelman from relying on extrinsic evidence to establish that they were interdependent components of a single contract, even if the impetus for the separation agreement and the amendment to the operating agreement arose from the marital situation, since the two agreements relate to different transactions, and Perelman assumed his obligation to capitalize Applehead prior to the divorce.

Perelman opposed Applehead's motion for summary judgment and cross-moved on May 5, 2009 for an order directing that his opposition and supporting papers be filed under seal. By notice dated April 24, 2009, he separately moved for an order granting summary judgment dismissing Applehead's complaint and directing that all papers submitted on the motion be filed under seal.

In support of his contention that the agreements were interdependent, Perelman submitted a letter from Barkin's matrimonial counsel to an attorney who represented Applehead, in which counsel stated, in part, that "[a]s part of that settlement, certain provisions regarding Applehead Pictures, LLC were changed." As support for his claim that Barkin had breached the obligation of confidentiality under the separation agreement, Perelman annexed media articles published in 2006 and 2007, including a March 19, 2006 New York Magazine article, which discussed the parties' marriage and relationship, and defendant's business and personal affairs. Perelman also contended that Applehead's damages should be mitigated by amounts Barkin contributed to it, referring to her deposition testimony that, starting in March 2006, she had made contributions amounting to between $1.5 million and $2 million to Applehead. Perelman further offered evidence, including the 2007 New York tax return of Applehead, which he claimed showed that the Barkins worked only part time for Applehead, and a credit card statement for December 2006, "reflecting over $9,000 of charges by Ms. Barkin for matters apparently unrelated to any legitimate business purpose."

The motion court granted Applehead's motion for summary judgment. It also denied Perelman's motion and cross motion to seal the record of the motion, finding that he had not shown good cause why his interests outweigh the public's right to access court records.

The court rejected Perelman's argument that Barkin's alleged breaches of the separation agreement relieved him of his funding obligations under the operating agreement. It found that extrinsic evidence could not be considered because the operating agreement "by its very terms stands on its own and is enforceable separately from, and without reference to, the separation agreement." (2009 NY Slip Op 33084[U], *8.) The two contracts are governed by laws of two different states, serve different purposes and do not have identical parties, and therefore are "two distinct and unrelated agreements, imposing separate obligations." (*Id.*)

The court also found that the claim that the Barkins had breached their fiduciary duties to Applehead was unavailing since those claimed breaches were the subject of the separate derivative claims, and are not a defense to enforcement of the operating agreement, since the Barkins are not alleged to have breached any obligations under that agreement. The court also relied on the provisions of the Delaware Limited Liability Company Act which provide that the obligation of a member "to perform any promise to contribute cash" is enforceable even if the member is unable to perform, and that the obligation "may be compromised only by consent of all the members" (Del Code Ann, tit 6, § 18-502).

Finally, the court rejected Perelman's argument that Applehead had not specified the nature of the damages it sought and could not establish lost profits, as well as his argument that damages should be "mitigated due to Ms. Barkin's voluntary funding to Applehead" under the *"Drinkwater* exception" to the collateral source rule. The court determined that the exception is a New York rule, not applicable in this case since the operating agreement is subject to Delaware law.

On this appeal, Perelman contends there are issues of fact concerning Barkin's alleged breaches of her obligations under the separation agreement to take steps to obtain a Get and maintain confidentiality that, if proven, would relieve him of his obligation under the operating agreement because the two agreements are interdependent. He additionally argues that he was relieved of his capital contribution obligations because Applehead breached the covenant of good faith and fair dealing by transferring assets to Applehead II, and the Barkins engaged in mismanagement and waste of assets.

Generally, "all contemporaneous instruments between the same parties relating to the same subject matter are to be read

together and interpreted as forming part of one and the same transaction" (*see TBS Enters. v Grobe*, 114 AD2d 445, 446 [1985] [internal quotation marks and citation omitted], *lv denied* 67 NY2d 602 [1986]). Nevertheless, "separate written agreements involving different parties, serving different purposes and not referring to each other [are] not intended to be interdependent or somehow combined to form a unitary contract" (*Schonfeld v Thompson*, 243 AD2d 343, 343 [1997]; *see also National Union Fire Ins. Co. of Pittsburgh, Pa. v Clairmont*, 231 AD2d 239 [1997], *lv denied* 91 NY2d 866 [1997]). As this Court stated in *National Union*, "Manifestly, one agreement may follow from and even have as its *raison d'etre* another and yet be independently enforceable" (*id.* at 241). Additionally, "in the absence of some clear indication that the parties had a contrary intention, contracts manifesting separate assents to be bound are generally presumed to be separable" (*id.* at 241-242, citing *Ripley v International Rys. of Cent. Am.*, 8 NY2d 430, 438 [1960]).

The record makes clear that the amended operating agreement and the separation agreement were not intended to be interdependent. The separation agreement, executed, naturally, only by Perelman and Barkin, recited that the parties intended to "settle their financial and property rights amicably and fulfill their other rights and obligations in conformity with and in addition to the terms of the Prenuptial Agreement." It made no reference to the original operating agreement or the amendment to the operating agreement, but only required Barkin to cause Applehead to vacate its offices in the marital residence.

The operating agreement, in contrast, was executed by Perelman, Barkin, and George Barkin in order to conduct a film development business, in accordance with the Delaware Limited Liability Company Act. It was amended by the three members when the separation agreement was executed by Perelman and Barkin, in order to remove Perelman from involvement in management and reduce his share of profits. Perelman's capital contribution obligation arose prior to the execution of the separation agreement, and was restated in the amended operating agreement without any reference to the separation agreement or any indication that it was now conditional upon Barkin's performance of her obligations under the separation agreement. Nothing in the agreements supports Perelman's contention that Barkin's promises in the separation agreement provided consideration for the amendment to the operating agreement.

Even if the agreements were found to be intertwined, the allegation that Barkin breached the provision of the separation agreement involving the Get is meritless. The separation agreement merely requires both parties to cooperate in obtaining a Get. Contrary to Perelman's contention, Barkin was not required to initiate proceedings to obtain a Get, and Perelman himself apparently did not do anything to advance proceedings before the religious tribunals until April 2008, which was over two years after the divorce and well after he had breached his obligations under the operating agreement.

 ■ Also unavailing is Perelman's claim that Barkin breached the confidentiality provision of the separation agreement. As Applehead notes, the March 2006 article in New York Magazine stated that Barkin "declined multiple requests to comment for this story, citing the confidentiality of their divorce agreement," and Barkin testified that she did not cooperate or answer a fact checker's questions. Perelman produces no contrary evidence. The other articles were all published after Perelman's breach, and also reflect that Barkin refused to comment on aspects of the marriage because of the confidentiality agreement. Perelman has not submitted any admissible evidence in support of his claim that Barkin breached the confidentiality agreement. It is also noteworthy that Perelman did not specifically plead the alleged breach in the answer filed in February 2009.

 ■ In any event, under Delaware law, the Barkins' alleged breaches would not operate to relieve Perelman of his independent obligations to the company. Delaware imposes an obligation on a member to "perform any promise to contribute cash or property or to perform services, even if the member is unable to perform because of death, disability or any other reason" (Del Code Ann, tit 6, § 18-502 [a]). A member's obligation "to make a contribution . . . may be compromised only by consent of all the members" (§ 18-502 [b]).

 ■ Further, the Barkins' alleged wrongdoing or breach of the covenant of good faith and fair dealing are not actions for which Applehead can be held responsible, but, rather, create a cause of action on behalf of Applehead. It is settled that a Delaware corporation cannot be held liable for directors' breaches of fiduciary duty. To do so "would be flatly inconsistent with the rationale of vicarious liability since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach" (*Arnold v Society for Sav. Bancorp, Inc.*, 678 A2d 533, 540 [1996] [internal quotation marks and citation omitted]).

■ Perelman also contends that Applehead's damages must be reduced by the amount of Barkin's "gratuitous" contribution to Applehead, under the *Drinkwater* exception to the collateral source rule. The *Drinkwater* doctrine, a minority New York rule, is a narrow exception to the collateral source rule, which the Court of Appeals has described as "inherently a tort concept" (*see Inchaustegui v 666 5th Ave. Ltd. Partnership*, 96 NY2d 111, 114-116 [2001], citing *Drinkwater v Dinsmore*, 80 NY 390 [1880]). The "collateral source rule" requires the tortfeasor to bear the full cost of the injury he or she has caused regardless of any benefit the victim has received from an independent or "collateral" source (*see Inchaustegui*, 96 NY2d at 115). The *Drinkwater* exception precludes an injured party from recovering when a third party gratuitously provides benefits. The rationale is to prevent double recoveries and avoid unjust enrichment by an injured person (*Moore v Leggette*, 24 AD2d 891 [1965], *affd* 18 NY2d 864 [1966]). The exception is inapplicable in this action seeking to enforce the contractual obligation of a member of a Delaware limited liability company to make a capital contribution (*see* Del Code Ann, tit 6, § 18-502).

The one case cited by Perelman in support of the proposition that the *Drinkwater* exception applies in contract cases arose from a claim for lost wages. The court reasoned that the exception did *not* apply to unemployment benefits received by a discharged employee because they were actually collateral benefits extended to an employee in consideration for previous services, rather than gratuitous payments (*Rutzen v Monroe County Long Term Care Program*, 104 Misc 2d 1000 [1980]).

Perelman also argues that the court erred in denying his request that the records be sealed, since the parties contracted for confidentiality, and that good cause for sealing had been shown given their concerns for privacy and the lack of countervailing public interest other than "sensationalized curiosity." Applehead does not oppose Perelman's request for sealing.

Uniform Rules for Trial Courts (22 NYCRR) § 216.1 (a) provides that "a court shall not enter an order in any action or proceeding sealing the court records, whether in whole or in part, except upon a written finding of good cause, which shall specify the grounds thereof," and requires the court to "consider the interests of the public as well as of the parties." The presumption of the benefit of public access to court proceedings takes precedence, and sealing of court papers is permitted only to serve compelling objectives, such as when the need for se-

crecy outweighs the public's right to access, e.g., in the case of trade secrets (see *Danco Labs. v Chemical Works of Gedeon Richter*, 274 AD2d 1, 6-7 [2000]). Thus, the court is required to make its own inquiry to determine whether sealing is warranted (see *Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V.*, 28 AD3d 322, 324 [2006], *lv denied* 10 NY3d 705 [2008]), and the court will not approve wholesale sealing of motion papers, even when both sides to the litigation request sealing (see *Matter of Hofmann*, 284 AD2d 92 [2001]). Since there is no absolute definition, a finding of good cause, in essence, "boils down to . . . the prudent exercise of the court's discretion" (*Mancheski v Gabelli Group Capital Partners*, 39 AD3d 499, 502 [2007] [internal quotation marks and citation omitted]).

This Court has stated,

> "[W]e remind the bench and bar that, even where the parties seek to stipulate to such relief, the trial court should not pro forma approve an anonymous caption, but should exercise its discretion to limit the public nature of judicial proceedings sparingly and then, only when unusual circumstances necessitate it" (*Anonymous v Anonymous*, 27 AD3d 356, 361 [2006] [internal quotation marks and citation omitted] [no showing evident in case involving child support]).

Perelman argues that the parties contracted for confidentiality, recognizing "their mutual privacy interests and the desirability of avoiding publicity about their personal lives," and such agreements are generally enforceable. He also relies on Domestic Relations Law § 235 (1), which provides that in a matrimonial action, separation proceedings or child custody proceedings, an officer of the court must maintain the confidentiality of "pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, written agreement of separation or memorandum thereof," and not permit copying or examination of such documents by anyone other than a party or his or her counsel. The rule reflects a "clear legislative design that those proceedings be kept secret and confidential" (*Shiles v News Syndicate Co.*, 27 NY2d 9, 14 [1970], *cert denied* 400 US 999 [1971]). Perelman argues the documents are of minimal public interest and that he had to rely on them to defend the instant action (see *Dawson v White & Case*, 184 AD2d 246, 247 [1992] [sealing record of accounting of a law firm; "mere curiosity" does not constitute legitimate public interest]; *see also Matter of Twentieth Century Fox Film Corp.*, 190 AD2d 483 [1993]).

■ In this case, however, Perelman annexed the prenuptial agreement, separation agreement and divorce judgment to the motion papers, and sought sealing of the entire record of the motion, not just the matrimonial documents. As a practical matter, if Perelman had filed those documents separately, and sought a limited order requesting that the confidentiality of those documents be maintained, such relief could appropriately have been granted (*see* Domestic Relations Law § 235 [1]). Since Perelman chose to annex all three documents in support of his defense to this breach of contract action, without first seeking a sealing order, we conclude that the court properly exercised its discretion in denying the motion.

Accordingly, the judgment of the Supreme Court, New York County (Debra A. James, J.), entered January 7, 2010, awarding plaintiff Applehead $4,367,421 against defendant Perelman, and bringing up for review underlying orders, same court and Justice, entered December 21, 2009, which granted plaintiff Applehead's motion for partial summary judgment and denied Perelman's motion for summary judgment dismissing Applehead's complaint and his motion and cross motion for an order sealing the record on the summary judgment motions, should be affirmed, with costs.

ANDRIAS, J.P., SAXE, FRIEDMAN and ACOSTA, JJ., concur.

Judgment, Supreme Court, New York County, entered January 7, 2010, affirmed, with costs.