Lonny Matlick, Linda Karp Ira, Chelsea Shoe Pension Plan, Bart Nydish Ttee, John Kuckku, Joanne Spiers, Robert Freed, Plaintiff,

against
Amtrust Financial Services, Inc., , Defendant.


INDEX NO.: 651349/2019

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 003) 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 181, 182, 183, 186 were read on this motion to/for DISMISS
The critical question raised by this lawsuit is whether an issuer can be held liable under the Securities and Exchange Act of 1933 (the 1933 Act) for the failure to disclose the risk that certain securities could be delisted when the issuer never guaranteed the listing of such securities in the first instance. Because the court answers that question in the negative, and for the reasons set forth below, Amtrust Financial Services, Inc.'s (AmTrust) motion to dismiss the second amended complaint (the Complaint) is granted, and the Complaint is dismissed in its entirety.
Relevant Factual Background
This action stems from AmTrust's January 18, 2019 announcement that it would delist and deregister certain securities (the Securities) issued by it between 2013 and 2016 effective February 7, 2019 (Compl., ¶¶ 6, 86). The Securities included six series of preferred stock known as the Series A, B, C, D, E, and F shares (the Preferred Stock), which apart from the Series A shares, principally consisted of depositary shares representing receipts for fractional interests in preferred stock (the ADRs), as well as interest-bearing subordinated notes (the Subordinated Notes). Holders of the Subordinated Notes receive quarterly interest payments (NYSCEF Doc. Nos. 160, 163).
AmTrust described the Securities in a series of prospectuses and prospectus supplements. The prospectuses gave investors "a general description of the securities [AmTrust] may offer" (NYSCEF Doc. No. 138, p. 1). With respect to preferred stock, the prospectuses told investors that the governing terms would be found in a "Certificate of Amendment" and the description contained in the prospectuses was "not complete and is subject to any Certificate of Amendment fixing the preferences, limitations and relative rights of a particular series of preferred stock" (id., p. 15). Similarly, with respect to the ADRs, the prospectuses advised that "it will be the deposit agreement entered into with respect to a particular offering of securities, and not [the] summary [contained in the prospectus], that will define a holder's rights as a holder of depository shares" (NYSCEF Doc. No. 144, p. 20). Finally, for debt securities, AmTrust's prospectuses instructed investors that the descriptions contained therein were "not complete" and advised investors to "review the form of the Indenture and the form of the applicable debt securities" (id., p. 6).
The Complaint alleges that the Securities were offered and sold to the public pursuant to certain Underwriting Agreements (as hereinafter defined) and were registered with the Securities and Exchange Commission (SEC) (Compl., ¶¶ 60-63). Each offering of Securities was registered and solicited through registration statements, prospectuses, supplemental prospectuses and other documents specifically incorporated by reference therein (the Offering Documents) (id., ¶¶ 24-53). The Complaint alleges that the Offering Documents made a number of representations as to the terms of the Securities, including that (i) the Securities were listed with the SEC, and that (ii) AmTrust would "list" the Securities on the New York Stock Exchange (NYSE) and maintain those listings (id., ¶¶ 3, 45, 66-78). The Plaintiffs contend that these representations were material to investors because the listing would (i) ensure AmTrust's SEC reporting requirements and corporate governance standards, and (ii) ensure that the Securities would be sellable on a recognized market, particularly as the Preferred Shares had no maturity date and the Notes would not mature until 2055 (id., ¶¶ 3, 32).
The Plaintiffs allege that they were left "devastated" when AmTrust announced that it would delist the Securities as of February, 2019 because, following this announcement, the price of Securities fell by approximately 35%, and, upon the delisting, liquid trading markets were no longer available for them to sell the Securities (id., ¶ 88).
The Plaintiffs now bring this action asserting claims for violations of Sections 11 and 12(a)(2) of the 1933 Act, based upon AmTrust's alleged material misstatements and omissions from the Offering Documents, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and claims for promissory and equitable estoppel. 
The Underwriting Agreements
AmTrust entered into a number of underwriting agreements (the Underwriting Agreements) with investment banks that would be the initial purchasers of the Securities (Compl., ¶¶ 60-63; NYSCEF Doc. Nos. 141, 146, 150, 154, 162, 165, 170). The Underwriting Agreements each contained a section titled "Covenants of the Company," in which AmTrust "covenants with each Underwriter" to a number of terms (e.g., NYSCEF Doc. No. 141, § 6 [emphasis added]). [*2]Among the covenants, AmTrust undertook "[t]o use its commercially reasonable efforts to list the Securities on the NYSE within 30 days of the Closing Date and to maintain the listing of the Securities on the NYSE" (id., § 6 [j]). Nothing in the Underwriting Agreements obligated the Underwriter to sell the securities at all or to anyone (i.e., they could be held for the Underwriters' own account) or otherwise indicated that the Underwriting Agreements were made or entered into for the benefit of any third party.
The Announcement
In early 2018, AmTrust announced that it was considering an offer by its founding shareholders and an investor to take the company private, and in March of 2018, AmTrust entered into a merger agreement (Compl., ¶¶ 79-80). As part of the merger agreement, AmTrust agreed that "each share of Preferred Stock shall remain outstanding in accordance with its terms" (id., ¶ 82). AmTrust then issued a proxy statement in which it assured investors that the Preferred Stock would continue to be listed on the NYSE and recommended that AmTrust's common stockholders vote for the transaction (id. ¶ 81). In a section titled "Questions and Answers About the Special Meeting and the Merger," AmTrust states that shares of common stock would cease to exist post-merger, but that "each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the [NYSE] following the merger" (NYSCEF Doc. No. 173 at 18). The proxy statement advised that the "Question and Answers" section contained "forward-looking statements" and that AmTrust "cannot assure you that the actual results or developments we anticipate will be realized (id. at 82).
The Delisting
As noted above, on January 18, 2019, AmTrust's Board of Directors approved the delisting and announced that it intended to file a Form 25, i.e., the application that an issuer files "to notify the [SEC] of its withdrawal of such securities from listing on [a] national securities exchange and its intention to withdraw the securities from registration" (17 CFR § 240.12d2-2[c][1]; NYSCEF Doc. No. 174). The press release announcing the delisting stated as follows:
AmTrust to Voluntarily Delist and Deregister All Series of Preferred Stock and Subordinated Notes
NEW YORK, January 18, 2019 - AmTrust Financial Services, Inc. ("AmTrust" or the "Company") today announced that its Board of Directors has approved the voluntary delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange.
The Company intends to voluntarily delist the Series A Preferred Stock (NYSE:AFSI-651 PA) (the (the "Listed Preferred Stock"), the Company's Depositary Shares representing 1/40th of a share of its Series B, C, D, E and F Preferred Stock, respectively (NYSE: AFSI-PB, AFSI-PC, AFSI- PD, AFSI-PE, AFSI-PF) (collectively, the "Listed Depositary Shares"), the Company's 7.25% Subordinated Notes due 2055 (NYSE: AFSS) and the Company's 7.50% Subordinated Notes due 2055 (NYSE: AFST) (collectively, [*3]the "Listed Subordinated Notes", and with the Listed Preferred Stock and the Listed Depositary Shares, the "Listed Securities").
The Company intends to file with the Securities and Exchange Commission ("SEC") a notification on Form 25 on or about January 28, 2019 to delist and deregister the Listed Securities under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Company expects the delisting of the Listed Securities to become effective on or about February 7, 2019 at which time AmTrust's SEC reporting obligations with respect to the Listed Securities will be suspended. AmTrust's decision to delist and deregister the Listed Securities was based on its determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume. In addition, this decision was made in light of the Company's new ownership structure and the resulting changes to its long-term strategy, following the completion of AmTrust's go-private transaction on November 29, 2018 and the delisting of its common stock.
Each series of the Preferred Stock and the Subordinated Notes will continue to remain an outstanding obligation of AmTrust. The Company plans to continue paying quarterly dividends and interest on the Listed Securities consistent with its rights and obligations.
(NYSCEF Doc. No. 177, ¶ 86 [emphasis added]).
On January 28, 2019, AmTrust filed its Form 25 notification with the SEC (id., ¶ 89). The delisting became effective 10 days after the January 28th filing — i.e., on February 7, 2019 (id.; NYSCEF Doc. No. 176; 17 CFR § 240.12d-2[c][2][ii]). The Plaintiffs do not allege that AmTrust has missed a single dividend or interest payment on any of the Securities since the delisting. 
DISCUSSION
I. The 1933 Act Claims Fail
The Plaintiffs allege that AmTrust violated Sections 11 and 12 of the 1933 Act because its "2015 Registration statement omitted or contained false and misleading information about the Series E and F Preferred Notes," in that that the Securities would be listed on a public market and subject to SEC reporting requirements (NYSCEF Doc. No. 177, ¶ 109). Put another way, the gravamen of the Plaintiffs' Complaint is that AmTrust failed to disclose in its Offering Documents that delisting the Securities was a possibility.
Sections 11 and 12(a)(2) of the 1933 Act impose "strict liability for material misstatements contained in registered securities offerings" (NECA-IBEW Health & Welfare Fund, 693 F3d 145, 148 [2d Cir 2012]; In the Matter of Netshoes Sec. Litig., 64 Misc 3d 926, 928 [Sup Ct NY Cnty 2019]). Specifically, Section 11 of the 1933 Act provides:
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, any person acquiring such security . . . [may] sue
(15 USC § 77k[a] [emphasis added]). 
As the United States Supreme Court explained in Omnicare, Inc. v Laborers Dist. Council Const. Indus., Section 11 liability for issuers may be premised both based on what a registration says and also what it does not say (135 S Ct 1318, 1322 [2015]). In either case, Section 11 imposes strict liability on issuers and signatories and negligence liability on underwriters (NECA-IBEW Health & Welfare Fund, 693 F3d at 156). As this court previously noted, whether a statement is materially false or misleading is viewed at the time such statement is made — not retroactively, in hindsight (Netshoes, supra, 64 Misc 3d 926). And, Section 12(a)(2) of the 1933 Act imposes liability against certain "statutory sellers" for misstatements or omissions in a prospectus (15 USC § 77l [a][2]).
Here, for the reasons set forth below, the Plaintiffs' Section 11 and 12 claims both fail.
A. Claims Based on Series E are Barred by the Statute of Repose
Section 13 of the 1933 Act contains both a statute of limitations and a statute of repose for Section 11 claims (California Pub. Empl. Retirement Sys. v ANZ Sec., Inc., 137 S Ct 2042, 2047; Bezio v General Electric Co., 66 Misc 3d 261, 273 [Sup Ct NY Cnty]). To wit, Section 13 of the 1933 Act provides:
No action shall be maintained to enforce any liability created under [§ 11] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . In no event shall any such action be brought to enforce a liability created under [§ 11] more than three years after the security was bona fide offered to the public [emphasis added]
(15 USC § 77m [emphasis added]). 
As this court previously observed in Bezio, the first sentence of the Section sets forth the relevant statute of limitations time period and the last sentence sets forth the statute of repose. 
Here, AmTrust argues that any claim with respect to Series E is barred by Section 13's three-year statute of repose and is, thus, untimely because the Plaintiffs did not assert their securities claims until August 14, 2019, when they requested permission to file their Second Amended Complaint (NYSCEF Doc. Nos. 130, 132), which is more than three years after AmTrust offered the Series E ADRs on March 15, 2016 (NYSCEF Doc. No. 177, ¶ 39). 
In their opposition papers, the Plaintiffs argue that their claims are timely because (i) the Complaint was unquestionably filed within one year of the delisting announcement and, in any event, (ii) the original complaint was filed within the three-year period on March 6, 2019, and the securities claims — although not asserted in the original complaint — are also timely under the [*4]relation back doctrine of CPLR 203(f). Simply put, the Plaintiffs are incorrect.
With respect to their first argument, i.e., that the action is timely under the one-year statute of limitations portion of Section 13, this argument ignores the very next sentence of Section 13 which "refines that limitation: 'In no event shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) more than three years after the' relevant offering or sale date" (John Hancock Life Ins. Co. (U.S.A.) v JP Morgan Chase & Co., 938 F Supp2d 440, 445 [SD NY 2013]). To find otherwise would read the words "in no event" out of the statute and render that phrase "entirely superfluous" (id. at 446). 
California Pub. Empl. Retirement Sys. v ANZ Sec., Inc. (137 S Ct 2042 [2017]) further highlights this point. In California Pub. Empl. Retirement Sys. v ANZ Sec., Inc., the United States Supreme Court addressed the question of whether the class action tolling doctrine articulated in American Pipe & Construction Co. v Utah, 414 US 538 (1974) applied to Section 13. In that case, the plaintiff, a member of a putative class, opted out of the timely-brought class action and chose to pursue his claims individually, but his complaint was filed more than three years after the allegedly wrongful conduct. The plaintiff argued that his action was timely because, among other things, the class-action complaint, itself, had been timely filed. The United States Supreme Court disagreed holding that the three-year time bar in Section 13 is a statute of repose, not a statute of limitations (id. at 2049), and explained that, whereas statutes of limitations are designed to encourage plaintiffs to timely pursue known claims, "statutes of repose are enacted to give more explicit and certain protection to defendants," and "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time" (id. [internal quotation and citation omitted]). Accordingly, statutes of repose begin to run on the last culpable act or omission of a defendant and are not subject to equitable tolling (id.). Put another way, the three-year time bar in Section 13 is "a complete defense to any suit after a certain period" (id. [emphasis added]).
With respect to their second argument, i.e., that the securities claims are timely because they relate back to the original complaint, the relation back doctrine does not apply to statutes of repose (Obstfeld v Thermo Niton Analyzers, LLC, 108 AD3d 658 [2d Dept 2013]). 
CPLR 203(f), which is titled "Method of Computing Periods of Limitation Generally," provides:
Claim in amended pleading. A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.
By its terms CPLR 203 applies only to "Periods of Limitation." The three-year period specified in Section 13, however, is a statute of repose, "which envelops both the right and the remedy" (Obstfeld, 108 AD3d at 658 [citation and quotation omitted]). The repose period is, thus, an absolute barrier and prevents any further right of action after the period has run (Tanges v Heidelberg N. Am., 93 NY2d 48, 55 [1999]). CPLR 203(f), therefore, is entirely inapplicable [*5]and cannot serve to extend the time in which the plaintiffs' securities claims must be brought (Obstfeld, 108 AD3d at 659). Accordingly, the Plaintiffs' Section 11 and 12 claims with respect to Section E are dismissed.
B. The Section 12 Claim Also Fails Because the Complaint Does Not Allege that AmTrust is a Statutory Seller
Section 12 of the 1933 Act imposes liability on any person who offers or sells securities by means of a prospectus containing material misstatements. It provides:
(a) In general
Any person who —
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus [emphasis added] or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
(15 USC § 77l [a][2]).
Section 12(a)(2) provides a private right of action for plaintiffs who purchased securities pursuant to a prospectus or oral communication that contained material misstatements or omissions (In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 359 [2d Cir 2010]). However, "[w]hereas the reach of Section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement" (id., citing Pinter v Dahl, 486 US 622, 643-47 & n 21(1988); see also Wilson v Saintine Exploration & Drilling Corp., 872 F 2d 1124, 1125-26 (2d Cir 1989); Mahar v General Electric Co., 65 Misc 3d 1121, 1129 [Sup Ct NY Cnty 2019]). To be considered a "statutory seller," a defendant must have either "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner" (id., [internal quotation omitted, citing Pinter v Dahl, 486 US 622, 647 [1988]). 
AmTrust argues that the 1933 Act Section 12 claims must be dismissed because the Plaintiffs do not allege that they purchased the Securities directly from AmTrust. In their opposition papers, the Plaintiffs argue that the Complaint alleges that the Plaintiffs purchased shares "traceable" to the public offering (Ptf. Memo. In Opp., NYSCEF Doc. No. 181, p. 9):
Plaintiffs and the other members of the Class acquired AmTrust's Series E and F Preferred Shares, each issued pursuant to the 2015 Registration Statement and relevant prospectus supplements. The offering documents for each series of Preferred Stock specifically incorporated by reference AmTrust's initial 2006 Registration Statement
(NYSCEF Doc. No. 177, ¶ 110). And, the Plaintiffs maintain that this is sufficient to maintain a claim under Section 12. It is not.
Following the Supreme Court's decision in Gustafson v Alloyd Co., "purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2) (In re Sterling Foster & Co., Inc., Sec. Litig., 222 F Supp 2d 216, 244-245 [ED NY 2002] [collecting cases]; Gustafson, 513 US 561 [1995]). Courts applying Gustafson have consistently held that merely alleging that a plaintiff brought securities "issued pursuant or traceable to" the offering documents is insufficient for purposes of Section 12(a)(2) standing (Freidus v Barclays Bank PLC, 734 F3d 132 [2d Cir 2013]; New Jersey Carpenters Health Fund v DLJ Mortgage Capital, Inc., 2010 WL 1473288 [SD NY January 23, 2013]; In re WRT Energy Sec. Litig., 1997 WL 576023 [SD NY September 15, 1997]). 
Recently, this court discussed both "tracing" and the "statutory seller" requirement for grounding 1933 Act liability in Mahar v General Electric Co., 65 Misc 3d 1121, 1129 [Sup Ct NY Cnty 2019]. In Mahar, a putative class of investors who participated in the GE Direct purchase and dividend plan known as "GE Stock Direct" allowed investors to purchase shares of General Electric Company (GE) stock through a plan administrator. Pursuant to GE Stock Direct, the plan administrator was permitted to purchase shares either as newly issued shares or shares from GE's treasury. The plaintiffs in that case purchased GE common stock pursuant to the registration statements and prospectus and alleged that certain prospectus supplements were materially misleading in that, among other things, they improperly recorded revenue, overstated earnings and incorporated false and/or misleading quarterly and annual reports, GE failed to timely increase its reserves for its LTC reinsurance business as required under state insurance regulations and GAAP, and that GE otherwise failed to properly account for its long term service agreements. In that case, the defendants argued that the plaintiffs lacked standing to bring claims under Sections 11 and 12 of the 1933 Act. 
With respect to the Section 11 claims, and relying primarily on The Hemmer Group v Southwest Water Co. (663 Fed Appx 496 [9th Cir 2016], the defendants argued that the Section 11 claims must be dismissed because the plaintiffs purchased their shares from the plan administrator and not GE and as such they could not "trace" their shares to the allegedly misleading offering documents or otherwise distinguish their shares from the pool of billions of previously registered shares in the market. This court noted that the Ninth Circuit's decision in The Hemmer Group finding of a lack of standing was made on summary judgment (i.e., and not on a motion to dismiss) for which a different standard applies and The Hemmer Group holding does not stand for the broad proposition that Section 11 standing can not be established by a plaintiff who acquired stock pursuant to a dividend reinvestment plan administered on behalf of the issuer which permits the purchase of stock that may come from a "fungible mass" of previously issued stock. And, inasmuch as stock dividend and reinvestment programs are offerings of securities (17 CFR § 230.415[a][1][ii]) and the common stock was offered to the plaintiffs from GE [*6]pursuant to the Plan that GE advertised on its website and where the GE Plan explained that GE had registered the offering of GE shares through the plan with the US Securities and Exchange Commission pursuant to the 1933 Act, this court held the fact that the security may be historic does not immunize it from being subject to a Section 11 claim if the security is reacquired by or for the benefit of the issuer and then subsequently offered in connection with allegedly materially misleading statements. 
Put another way, this court held inasmuch as the plaintiffs alleged that they purchased their securities traceable to the misleading offering documents, the plaintiffs sufficiently alleged Section 11 standing to survive a motion to dismiss. Significantly, the plan administrator, who was retained and compensated by GE, purchased the securities not for its own account, but in connection with the GE plan and for the benefit of the plaintiffs, and as such, it necessarily, pursuant to Rule 415, was an offering of securities pursuant to the registration documents — i.e., it was the same as if GE bought the stock itself and then reissued it pursuant to the offering documents. 
With respect to the Section 12 claims, the defendants argued that the plaintiffs could not establish Section 12 standing because they purchased their securities from the plan administrator and not from GE directly. In rejecting the defendants' position, this court held that, under the circumstances, the plan administrator should not be regarded as separate from GE and that GE qualified as a statutory seller (In re Morgan Stanly Info. Fund Sec. Litig., 592 F3d at 359), because the plaintiffs were not "remote purchasers" trying to "recover against their seller's seller" (Pinter, 486 US at 644, n 21). This is wholly different from the allegations in this case where the plaintiffs fail to allege that they purchased their securities from AmTrust in connection with the IPO. Accordingly, the Section 12 claims must be dismissed.[FN1]

C. Plaintiffs Fail to Allege Any Actionable Misstatement or Omission as Required for Their Securities Claims
In light of the foregoing, the only potential remaining viable 1933 Act claim is the Section 11 claim with respect to the Series F ADRs. This claim, however, also fails as it is based on nothing more than the alleged omission, i.e., the lack of warning in the Registration Statement for the Series F ADRs that AmTrust could voluntarily delist those Securities (NYSCEF Doc. No. 177, ¶¶ 78, 115-116). This is insufficient to state a Section 11 claim. As this court has [*7]previously observed, Section 11 does not require disclosure of publicly available information (In re Netshoes Sec. Litig., 64 Misc 3d 926, 933 [Sup Ct NY Cnty 2019], citing In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F Supp2d 243, 249-50 [SD NY 2003]). AmTrust's ability to delist is publicly set forth by statute, in regulations, and in the NYSE rules (see 15 USC 78l[d] [allowing an issuer to "withdraw from listing and registration" a "security registered with a national securities exchange"]; 17 CFR 240.12d2-2[c] [SEC rule allowing for delisting and deregistration by filing a Form 25 application on 10-days notice]; NYSE Listed Company Manual 808.00). AmTrust had no duty to inform investors of the fact that it could one day voluntarily delist its Securities, a fact which federal law has always made clear (see Footbridge Ltd. v Countrywide Home Loans, Inc., 2010 WL 3790810, *15 ["federal securities laws do not compel defendants to state the obvious"]).
The Plaintiffs' argument to the contrary is based on one sentence in AmTrust's 2006 shelf registration statement, which was incorporated by reference into the registration statement for the Series F ADRs, wherein AmTrust states that it would use "commercially reasonable efforts" to list "our common stock on either the New York Stock Exchange or the Nasdaq Market as soon as practicable and thereafter maintain the listing on such exchange or market" (NYSCEF Doc. No. 177, ¶ 112). To the extent that this statement may be actionable, it is plainly limited to AmTrust's common stock and does not say anything about preferred securities such as the Series F ADRs.
Sonesta International Hotels Corp. v Wellington Assoc., cited by the Plaintiffs, does not suggest a different conclusion (483 F2d 247 [2d Cir 1973]). In Sonesta, the court held that a tender offeror should have disclosed that the success of its offer could result in the stock being involuntarily delisted (id. at 253-54). The plaintiff in that case alleged that:
[the defendant] Wellington failed to disclose, in connection with its cash tender offer announced in the Wall Street Journal on May 9, 1973, for 1,000,000 shares of Sonesta common [stock] at $7 per share, several material facts which were necessary to make the cash offer, as published, and the Schedule 13D filed with the SEC on May 8 concerning the cash offer, not misleading, in violation of §§ 10(b), 13(d), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d), and 78n(e) (1971).
With respect to potential delisting, the court found that, "Wellington should have disclosed the prospect that if its offer should be fully successful Sonesta common stock could have lost its listing privileges on the New York Stock Exchange" (id. at 253). In making this finding, the Second Circuit disagreed with the trial court's conclusion that the delisting was too speculative to make this omission material because:
Section A-16 of the Exchange Rules permits but does not require removal or suspension of a listed security if the publicly held shares number less than 600,000 and their aggregate market value is less than $5 million. Of Sonesta's 2,393,817 outstanding shares, 1,572,839 were publicly held according to the Exchange's definition, the balance of 820,978 being owned by officers and directors of Sonesta and their immediate [*8]families. If Wellington had achieved its goal of acquiring 1,000,000 shares, the publicly held stock would have been reduced below the Exchange standards in both number and aggregate value. Wellington [] suggests that it could not know in advance how many Sonesta shareholders would accept its offer. Sonesta counters, by affidavit of its general counsel, that the Exchange had advised Sonesta that it could lose its listing privileges if Wellington's offer was successful. Under these circumstances the risk of delisting was sufficiently appreciable to require disclosure.
(id. at 253-54 [emphasis added]).
The Sonesta defendants failure to disclose a "sufficiently appreciable" risk of delisting in the event of a successful tender offer, which it was trying to accomplish, does not stand for the proposition that a registration statement which does not disclaim that the securities will be listed in perpetuity is materially misleading if the securities subsequently are delisted where delisting was not a known risk at the time of the IPO. Here, all the Complaint alleges is that AmTrust should have disclosed the fact that the company could delist at some point in the future. This — unlike Sonesta — is, indeed, too speculative (and, indeed, too obvious) to have required disclosure.
II. The Breach of Contract Claims Fail
The Plaintiffs allege that a contract was formed between the Plaintiffs and AmTrust when AmTrust made an offer to sell, or solicited an offer to buy, the Securities, and that the relevant terms of that contract entered into when the Plaintiffs purchased the Securities are that (i) the Securities would be registered with the SEC and that (ii) AmTrust would "list" the Securities on the NYSE and maintain that listing. Contrary to including a listing promise or a promise to continue listing the Securities in perpetuity, however, the Certificate of Designations for the Series A Preferred Stock states only that the Preferred Stock "may then be listed or quoted" on "any securities exchange or other trading facility" (NYSCEF Doc. No. 142, s 7[b]). The Certificate of Designations advised stockholders that they "shall not have any powers, preferences, privileges or rights other than as set forth" therein (id., s 15). The Deposit Agreements for the remainder of the Securities are substantially the same — they only state that the ADRs "may be listed" on a "stock exchange" (NYSCEF Doc. No. 148, s. 5.01). It is well-settled that "may" (as opposed to "shall" or even "will") is a "permissive term" that does not create an obligation (Novelty Crystal Corp. v PSA Institutional Partners, L.P., 49 AD3d 113, 115 [2d Dept 2008]). The Indenture governing the Subordinated Notes is also clear that there is no promise to list the Securities nor to keep them listed (see NYSCEF Doc. No. 139, s. 2.01[a], s. 9.01[b]; see also, NYSCEF Doc. No. 160, s. 2.02[a]). The prospectuses and prospectus supplements, on which the plaintiffs rely, likewise contain no promise to continue listing the securities (and plaintiffs identify none). 
In addition, the Underwriting Agreements and other documents that the Plaintiffs seek to incorporate into the Governing Documents were neither explicitly nor implicitly incorporated (see CIFG Assurance N. Am., Inc. v Goldman, 106 AD3d 437 [1st Dept 2013] [citing Applehead v Perelman, 80 AD3d 181 (1st Dept 2010) ("separate written agreements involving different parties, serving different purposes and not referring to each other [are] not intended to be [*9]interdependent or somehow combined to form a unitary contract"); see also National Union Fire Ins. Co. of Pittsburgh, Pa. v Clairmont, 231 AD2d 239 [1st Dept 1997], lv denied 91 NY2d 866 [1998]).
And, the prospectuses, in any event, and as discussed above, expressly advised that with respect to the preferred stock, the governing terms would be found in a "Certificate of Amendment" and the description contained in the prospectuses was "not complete and is subject to any Certificate of Amendment fixing the preferences, limitations and relative rights of a particular series of preferred stock" (NYSCEF Doc. No. 138, p. 15), and that with respect to the ADRs, "it will be the deposit agreement entered into with respect to a particular offering of securities, and not [the] summary [contained in the prospectus], that will define a holder's rights as a holder of depository shares" (NYSCEF Doc. No. 144, p. 20). And, in any event, none of these documents contain a promise to maintain the public listing of these Securities in perpetuity. Finally, and for the avoidance of doubt, any representations in the 2006 Registration Statement to use commercially reasonable efforts to list and maintain the common stock also do not provide a basis for relief because, inter alia, as the Plaintiffs do not allege that AmTrust failed to use commercially reasonable efforts to maintain the listing of the securities at issue in this case. As previously discussed, the crux of the Complaint is that AmTrust delisted the Securities and the offering documents were materially misleading because they failed to disclose the risk of delisting, a publicly known possibility. Accordingly, the breach of contract claims must be dismissed.
III. The Claim for Breach of the Covenant of Good Faith and Fair Dealing is Duplicative
The Plaintiffs' breach of covenant of good faith and fair dealing claim, although pled in the alternative, is essentially the same as its breach of contract claim: it is based on the same purported contracts, alleges the same breach (the delisting) and the same harm (a reduction in value and a lack of secondary market), and seeks the same damages. A claim for breach of the implied covenant of good faith and fair dealing cannot be maintained where "it is premised on the same conduct that underlies the breach of contract cause of action and is 'intrinsically tied to the damages allegedly resulting from a breach of contract'" (MBIA Ins. Corp. v Merrill Lynch, 81 AD3d 419, 419-20 [1st Dept 2011], quoting Hawthorne Group v RRE Ventures, 7 AD3d 320 323 [1st Dept 2004]). Accordingly, the claim for breach of covenant of good faith and fair dealing must be dismissed.
IV. Plaintiffs are Not Third-Party Beneficiaries Under Amtrust's Underwriting Agreements
A party seeking to assert rights as a third-party beneficiary must establish (i) the existence of a valid contract between other parties, (ii) intended for his benefit, and (iii) that the benefit is "sufficiently immediate, rather than incidental, to indicate assumption by the contracting parties of a duty to compensate him if the benefit is lost" (California Pub. Empl. Ret. Sys. v Shearman & Sterling, 95 NY2d 427, 434-35 [2000]). Critically, the intent to benefit a third party must be clear from the face of the contract (LaSalle Natl. Bank v Ernst & Young, LLP, 285 AD2d 101, 108-09 [1st Dept 2001]). A merely incidental beneficiary under a contract is without right to enforce that agreement (Dormitory Auth. v Samson Constr. Co., 30 NY3d 704, 710 [2008]).
To the extent that the Plaintiffs' contract claims are based on the Underwriting Agreements, the Plaintiffs are not third-party beneficiaries under those Agreements as nothing in them indicates as much. Critically, as discussed supra, AmTrust's covenants under the Underwriting Agreement are expressly only "with each Underwriter" and are, thus, not for the benefit of any third-party (NYSCEF Doc. No. 141, § 6). Accordingly, the claims based on the Underwriting Agreements are dismissed.
V. The Estoppel Claims Also Fail
A claim for promissory estoppel cannot lie where there is a contract between the parties (Susman v Commerzbank Capital Markets Corp., 95 AD3d 589, 590 [1st Dept 2012]). Nor can breach of contract claims be asserted under the guise of equitable estoppel as the plaintiffs seek to do here. Both claims are also duplicative of the breach of contract claims (id., citing Celle v Barclays Bank, P.L.C. (48 AD3d 301 [1st Dept 2008]). These claims are dismissed.
Accordingly, it is
ORDERED that the defendant's motion to dismiss is granted and the second amended complaint is dismissed; and it is further
ORDERED that the Clerk of the Court, upon service upon him (60 Centre Street, Room 141B) of a copy of this order with notice of entry is directed to enter judgment dismissing the action; and it is further
ORDERED that such service upon the Clerk of the Court shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (accessible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh).
3/16/2020



Footnotes

Footnote 1:For completeness, in their February 27, 2020 Rule 18 Letter, the Plaintiffs cite PPDAI Group Sec. Litig. v XXX, 66 Misc 3d 1226[A] [Sup Ct NY Cnty February 26, 2020]), in which the court found Section 12 standing as against the issuer and the underwriters where the plaintiffs alleged that they purchased securities in connection with the Initial Public Offering relying on In re IDreamsky Technology Ltd. Sec. Litig.,236 F.Supp.3d 824, 832 (SDNY 2017). In IDreamsky, the underwriter defendants moved to dismiss alleging that they were not statutory sellers. The court in that case held that inasmuch as the plaintiffs alleged that the underwriter defendants offered the securities to the class, solicited the purchase of those securities through the preparation of the offering documents and profited from the transaction, it was sufficient to justify Section 12(a)(2) standing and to give the underwriters "fair notice of the basis of the claims against them," citing In re Worldcom, Inc. Sec. Litig, 294 F Supp 2d 392, 423 (SDNY 2003). The court further commented, "it is sufficient to allege that they purchased [the securities] in connection with the IPO." Here, the Plaintiffs do not even allege that.